UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-cr-193 (PJS/LIB) (1) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Amanda May Walsh (1), | |
| Defendant. | |
| UNITED STATES OF AMERICA, | Case No. 19-cr-193 (PJS/LIB) (2) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Matthew James Gunderson (2), | |
| Defendant. | |

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Matthew James Gunderson's (hereinafter "Defendant Gunderson") Motion to Sever Defendants, [Docket No. 44]; Defendant Gunderson's Motion for Suppression of Confessions or Statements in the Nature of Confessions, [Docket No. 45]; Defendant Gunderson's Motion for Suppression of Evidence Obtained With a Warrant, [Docket No. 46]; Defendant Amanda May Walsh's (hereinafter "Defendant Walsh") Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, [Docket No. 52]; and Defendant Walsh's Motion to Sever Defendants. [Docket No. 54]. The Court held a Motions Hearing on September

13, 2019, regarding the parties' pretrial motions.[1] At the motions hearing, the parties requested the opportunity to submit supplemental briefing, and the Court granted the parties' request. Upon the completion of that briefing, the Defendants' Motion to Suppress and Sever were taken under advisement.

For reasons discussed herein, the Court recommends that Defendant Gunderson's Motion to Sever Defendants, [Docket No. 44], be **DENIED without prejudice**; that Defendant Gunderson's Motion for Suppression of Confessions or Statements in the Nature of Confessions, [Docket No. 45], be **DENIED**; that Defendant Gunderson's Motion for Suppression of Evidence Obtained With a Warrant, [Docket No. 46], be **DENIED**; that Defendant Walsh's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, [Docket No. 52], be **DENIED**; and that Defendant Walsh's Motion to Sever Defendants, [Docket No. 54], be **DENIED without prejudice**.

## I.   Background and Statement of Facts

### A.  Background

Defendant Gunderson is charged with three counts of production and attempted production of child pornography in violation of 18 U.S.C. §§ 2251(a) and 2251(e); one count of distribution of child pornography in violation of 18 U.S.C. §§ 2251(a)(2) and 2252(b)(1); and three counts of receipt of child pornography in violation of 18 U.S.C. §§ 2251(a)(2) and 2252(b)(1). (Indictment [Docket No. 28]).

Defendant Walsh is charged with three counts of production and attempted production of child pornography in violation of 18 U.S.C. §§ 2251(a) and 2251(e); two counts of distribution of child pornography in violation of 18 U.S.C. §§ 2251(a)(2) and 2252(b)(1); one count of

---

[1] The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 63].

receipt of child pornography in violation of 18 U.S.C. §§ 2251(a)(2) and 2252(b)(1); and one count of possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Indictment [Docket No. 28]).

### B. Facts

The record presently before the Court indicates that sometime between the late night hours of February 9, 2019, and into the early morning hours of February 10, 2019, Samantha Clark, Defendant Walsh's niece, asked Defendant Walsh if Ms. Clark's husband, Dustin Clark, could borrow Defendant Walsh's daughter's phone for the day. (Gov't Ex. 7 at 1:15–2:23).[2] Defendant Walsh gave Ms. Clark her daughter's phone in the upstairs of their residence, and Ms. Clark took the phone to her husband downstairs. (Id.).[3] Upon receiving the phone, Ms. Clark used her phone to send a text message to Defendant Walsh asking for the "pin" to unlock Minor A's phone, and Defendant Walsh sent Ms. Clark the "pin" to unlock the phone. (Gov't Ex. 6 at 8:00–9:00).[4] A "few minutes" after Ms. Clark received Minor A's phone, Defendant Walsh sent a text message to Ms. Clark's phone instructing here to "go ahead and just delete all three conversations please don't read just delete she [apparently referring to Minor A] asked." (Gov't Ex. 7 at 1:15–2:23).

Upon receiving this request to delete certain conversations from Minor A's phone, Ms. Clark went into Minor A's phone to see what the messages were. (Id. at 2:23–3:10). Ms. Clark

---

[2] Government's Exhibit 7 is a CD audio recording of the February 10, 2019, interview of Savannah Clark at her residence. At the Motions Hearing, the Government, without objection, offered the CD audio recording into evidence as Government's Exhibit 7. (September 13, 2019, Motions Hearing, Digital Recording at 12:08–12:17). The citations to the audio recording are in a MM:SS format.

[3] Ms. Clark is Defendant Walsh's niece. (See, Id.). Defendant Walsh; Defendant Walsh's minor daughter (hereinafter "Minor A"); Ms. Clark; Ms. Clark's husband; and Defendant Walsh's parents all reside at the same residence. (See, gen., Id.).

[4] Government's Exhibit 6 is a CD audio recording of the February 10, 2019, interview of Defendant Amanda Walsh at her residence. At the Motions Hearing, the Government, without objection, offered the CD audio recording into evidence as Government's Exhibit 6. (September 13, 2019, Motions Hearing, Digital Recording at 11:26–11:28). The citations to the audio recording are in a MM:SS format.

observed text messages of a sexual nature which she believed had been sent from Defendant Gunderson to Minor A, as well as, nude pictures of a sexual nature of Minor A which had been sent from Minor A's phone to Defendant Gunderson. (Id. at 3:00–4:15). Ms. Clark believed that at least some of the pictures of Minor A appeared to have been taken by Defendant Walsh. (Id. at 4:15–5:00).

Upon discovering the text messages and photos, Ms. Clark began showing the contents of the phone to her husband, Dustin Clark. (Gov't's Ex. 8 at 2:07–3:48).[5] Mr. Clark also observed nude pictures of a sexual nature of Minor A, as well as, text messages indicating that Defendant Walsh had digitally penetrated Minor A's vagina and Defendant Gunderson had vaginally penetrated Minor A with his penis. (Id.). Ms. Clark then gave the phone to Defendant Walsh's mother. (See, Id. at 10:30–10:50). Defendant Walsh then took the phone from her mother. (Id.). Mr. Clark "snatched" the phone from Defendant Walsh and "ran" outside to call 911 because he believed Defendant Walsh was going to delete the photos and messages he had observed. (Id. at 3:40–4:00; 10:00–11:30).[6] After he "snatched" the phone, Defendant Walsh asked Dustin Clark to return the phone. (Gov't's Ex. 6 at 10:18–11:00).

After Mr. Clark had exited the residence, he called 911. (Gov't's Ex. 1 at 00:00–2:00).[7] Mr. Clark asks the 911 operator to send an officer to the residence. (Id.). After Mr. Clark requested an officer's presence, a female voice can be heard at a distance in the background

---

[5] Government's Exhibit 8 is a CD audio recording of the February 10, 2019, interview of Dustin Clark at his residence. At the Motions Hearing, the Government, without objection, offered the CD audio recording into evidence as Government's Exhibit 8. (September 13, 2019, Motions Hearing, Digital Recording at 12:08–12:17). The citations to the audio recording are in a MM:SS format.

[6] Defendant Walsh later told law enforcement that she had placed the phone between her legs in the standing position, and to "snatch" the phone, Mr. Clark grabbed Defendant Walsh's wrist to move her arm out of the way. (Gov't's Ex. 6 at 9:00–11:00).

[7] Government's Exhibit 1 is a CD audio recording of the two 911 calls Mr. Clark placed on February 10, 2019. At the Motions Hearing, the Government, without objection, offered the CD audio recording into evidence as Government's Exhibit 1. (September 13, 2019, Motions Hearing, Digital Recording at 11:12–11:15). The citations to the audio recording are in a MM:SS format.

4

yelling, "It's my phone." (<u>Id.</u>). Mr. Clark responds, "No it's not. Not when you go to jail bitch." (<u>Id.</u>). Mr. Clark then begins describing to the 911 operator the messages and images he and Ms. Clark had observed on Minor A's phone. Mr. Clark then tells an unspecified person that Defendant Walsh should stay at the residence, and the 911 operator then asks as to whether or not Defendant Walsh is leaving. (<u>Id.</u>). Mr. Clark responds stating that he and the others present wanted Defendant Walsh arrested and "out of here" because she did not need to be around Minor A. (<u>Id.</u>). The 911 call was then terminated having been approximately two minutes in length.

An unspecified time later, Mr. Clark places a second 911 call inquiring as to when the officer will arrive. (<u>Id.</u> at 2:00–3:50). Mr. Clark informs the 911 operator that he is asking about the officer because the "grandparents" are trying to keep Defendant Walsh in the house because she said she was going to walk away from the house with Minor A. (<u>Id.</u>). The 911 operator informs Mr. Clark that an officer is on the way, Mr. Clark thanks the 911 operator, and the 911 call is then ended. (<u>Id.</u>).

The 911 operator had notified Aitkin County Sherriff's Deputy Keith Bennett (hereinafter "Deputy Bennett") of a "disturbance or some kind of altercation" at the residence regarding "a cell phone and some images that were found." (September 13, 2019, Motions Hearing, Digital Recording at 11:08–11:13). Deputy Bennett arrived at the scene a short time later.

Upon arriving at the residence, Deputy Bennett parked his patrol vehicle in the residence's driveway where he observed three individuals he later identified as Savannah Clark; Dustin Clark; and Defendant Walsh's mother, Barb Walsh. (<u>Id.</u>). Deputy Bennett began speaking with the three individuals, and the individuals collectively began describing the situation to Deputy Bennett. (<u>Id.</u> at 11:08–11:18). As they explained the situation to Deputy Bennett, they scrolled through Minor A's "white Moto" phone reading aloud the text messages and showing

Deputy Bennett the images of Minor A in various "sexual poses." (Id.). After speaking with the three individuals, Deputy Bennett "collected the phone and threw if on [his] front seat of [his] patrol vehicle and locked the doors." (Id.).

After placing Minor A's phone in his patrol car, Deputy Bennett went into the residence to speak with Defendant Walsh. (Id.). Deputy Bennett initially spoke with Defendant Walsh in the living room of the residence, where she informed him that the phone in his patrol vehicle belonged to Minor A, and that Defendant Walsh had two phones—a working phone and a non-working phone. (Id. at 11:17–11:27). Defendant Walsh signed a Consent to Search Form indicating she was providing law enforcement permission to search both of her phones, as well as, Minor A's phone. (Gov't Ex. 5).[8] Deputy Bennett then took possession of both of Defendant Walsh's phones, and he took photographs of the residence. (September 13, 2019, Motions Hearing, Digital Recording at 11:19–11:29). Deputy Bennett then asked Defendant Walsh if they could speak privately, and the conversation moved to Defendant Walsh's bedroom. (September 13, 2019, Motions Hearing, Digital Recording at 11:19–11:33).

During the recorded interview in Defendant Walsh's bedroom, Defendant Walsh told Deputy Bennett that Ms. Clark had requested if Mr. Clark could borrow Minor A's phone; that Defendant Walsh agreed and gave her the phone; and that after providing her the "pin" to get into Minor A's phone, she asked Ms. Clark to delete some messages so they would not get them "confused." (Gov't Ex. 6 at 1:00–2:00). Defendant Walsh also stated that at some unspecified point after she had given the phone to Ms. Clark, Defendant Walsh had gotten the phone back and had it between her legs in the standing position when Mr. Clark grabbed her wrist to move

---

[8] Government's Exhibit 5 is a copy of the Aitkin County Sheriff's Office Consent to Search Form executed by Defendant Amanda Walsh on February 10, 2019. At the Motions Hearing, the Government, without objection, offered the copy of the Consent to Search Form into evidence as Government's Exhibit 5. (September 13, 2019, Motions Hearing, Digital Recording at 11:23–11:25).

her arm in order to take Minor A's phone away from Defendant Walsh again. (Id. at 2:00–3:50, 8:00–10:18). Defendant Walsh explained that the conversations the others had seen were likely conversations between her, Defendant Gunderson, and Defendant Gunderson's ex-wife; and, Defendant Walsh denied having any knowledge about any nude photos of her minor daughter. (Id. at 12:45–22:18). Defendant Walsh gave Deputy Bennett the "pin" numbers for each of the three phones, and she also informed him of the "pin" for the mobile application she used to securely store photographs. (Id. at 22:18–26:40). At the conclusion of the recorded interview, Deputy Bennett placed Defendant Walsh under arrest. (September 13, 2019, Motions Hearing, Digital Recording at 11:26–11:29).

Prior to Deputy Bennett's recorded conversation with Defendant Walsh, Deputy Bennett's partner, Aitkin County Sherriff's Deputy Nathan Parenteau, arrived on the scene. (See, Gov't Ex. 8; Gov't's Ex. 7). While Deputy Bennett spoke with Defendant Walsh, Deputy Parenteau interviewed Dustin and Savannah Clark, as well, as Defendant Walsh's parents. (See, Gov't Ex. 8; Gov't's Ex. 7). In addition to the facts as already discussed above, Dustin Clark, at the conclusion of his interview, informed Deputy Parenteau that he was giving his statement voluntarily stating, "I'm doing this on my own 'cause that little girl needs to be protected." (Gov't's Ex. 8 at 11:30–11:41). During her interview, Samantha Clark indicated that she and other members of her family had expressed concern as to Defendant Walsh's ability to be a qualified parent, and Ms. Clark expressed concern for Minor A's well-being. (See, Gov't's Ex. 7).

On February 12, 2019, Deputy Parenteau applied for a State Court search warrant seeking permission to search the three cell phones seized on February 10, 2019. (Gov't's Ex. 9).[9] The application for a Search Warrant was approved on February 13, 2019. (Id.).

On February 22, 2019, the Aitkin County Sheriff's Office contacted Special Agent John Nordberg (hereinafter "SA Nordberg") with the Minnesota Bureau of Criminal Apprehension to assist in the investigation underlying the present case. (September 13, 2019, Motions Hearing, Digital Recording at 12:42–12:53). After SA Nordberg became involved in the investigation, he applied for and obtained a State Court search warrant authorizing law enforcement to search Defendant Gunderson's residence in Willow River. (Id.; Gov't's Ex. 10).[10]

SA Nordberg interviewed Defendant Gunderson on March 1, 2019, at his residence in Willow River. (September 13, 2019, Motions Hearing, Digital Recording at 12:44–12:53). To arrange that interview, SA Nordberg "reached out to the Kanabec County Human Services Department that had a child protection investigation involving [Defendant] Gunderson and asked them to arrange a meeting with him on Friday, March 1st, around noon." (Id.). SA Nordberg testified that he reached out to Kanabec County to arrange the meeting because law enforcement knew Defendant Gunderson was "transient" with "multiple addresses" and he worked remotely at different locations around the State of Minnesota. (Id.).

SA Nordberg testified that he; his partner, Special Agent Adam Wright; and Investigator Sheryl Cook of the Aitkin County Sheriff's Officer went to Defendant Gunderson's Willow

---

[9] Government's Exhibit 9 is the warrant application, supporting affidavit, and the warrant to search the three mobile phones. At the motions hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 9. (September 13, 2019, Motions Hearing, Digital Recording at 12:25–12:36).

[10] Government's Exhibit 10 is the warrant application, supporting affidavit, and warrant to search the three mobile phones seized on February 10, 2019, as well as, two additional mobile phones Defendant Walsh's mother provided to law enforcement. At the motions hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 10. (September 13, 2019, Motions Hearing, Digital Recording at 12:25–12:36).

River residence to conduct the interview. (September 13, 2019, Motions Hearing, Digital Recording at 12:44–12:53). SA Nordberg testified that he was wearing a black jacket and pants; SA Walsh was wearing jeans and a jacket; and Investigator Cook was wearing a jacket and polo shirt that each read, "Aitkin County Sheriff's Office," as well as, "cargo-type pants" with a "duty belt." (Id.). All three law enforcement officers were wearing holstered sidearms. (Id.).

SA Nordberg recorded the entirety of the encounter with Defendant Gunderson. The recording began before SA Nordberg exited his vehicle at the residence, and it ended after he exited the residence. (Id. at 12:45–12:53). As SA Nordberg approached the residence, Defendant Gunderson was on the front porch. (Id. at 12:46–12:52). SA Nordberg introduces himself as "Jon Nordberg," and he asks, "can we go inside Matt or is there a place we can talk privately?" (Gov't's Ex. 14 at 00:00–1:30).[11] At the September 13, 2019, Motions Hearing, SA Nordberg testified that he believed that upon approaching the residence he either showed Defendant Gunderson his badge on his belt near his firearm or showed him his wallet badge. (September 13, 2019, Motions Hearing, Digital Recording at 1:15–1:23). Defendant Gunderson replied that he was "waiting for a person from Kanabec County to come talk to" him. (Gov't's Ex. 14 at 00:00–1:30). SA Nordberg then offers to explain the situation, and Defendant Gunderson asks, "is there something I need to know about before I go in there." (Id.). SA Nordberg again offers to explain the situation, and he asks if there is a place they can go to talk quietly. (Id.). Defendant Gunderson indicates that his grandmother is inside the residence, and he expresses a reluctance to want to talk around his grandmother. (Id. at 1:00–2:50). SA Nordberg again asks if there is

---

[11] Government's Exhibit 14 is a CD audio recording of the entire time SA law enforcement was at Defendant Gunderson's residence, including the interview with Defendant Gunderson in his bedroom. At the Motions Hearing, the Government, without objection, offered the CD audio recording into evidence as Government's Exhibit 14. (September 13, 2019, Motions Hearing, Digital Recording at 12:45–12:53). The citations to the audio recording are in MM:SS format.

place where they can go to talk. (Id.). Defendant Gunderson says "yeah," and he leads the officer into the residence.

Upon entering the residence, Defendant Gunderson's grandmother, Ms. Kwapick, asks SA Nordberg the purpose of the visit. (Id.). SA Nordberg responds that he and the other officers want to talk to Matt about a "situation." (Id.). Ms. Kwapick asks what "the situation is"; why Defendant Gunderson had not had "papers" served on him; and what was wrong. (Id.). SA Nordberg states that nothing is wrong with what is going on in Kanabec County, and informs Ms. Kwapick that Kanabec County personal will come to talk with Defendant Gunderson at a later time. An unidentified female voice can also be heard telling Ms. Kwapick that this is a separate issue from the Kanabec County issue, and Defendant Gunderson can be heard telling Ms. Kwapick that the officers are not from Kanabec County. (Id. at 2:49–5:40). Ms. Kwapick asks if the visit has to do with the custody of Defendant Gunderson's children to which SA Nordberg responds, "no." (Id.). Lastly, Ms. Kwapick asks what the officers want to talk with Defendant Gunderson about, and SA Nordberg informs her that the officers would talk with Matt about that. (Id.).

Defendant Gunderson then directs SA Nordberg and Investigator Cook to his bedroom and he retrieved chairs so the three can sit. (September 13, 2019, Motions Hearing, Digital Recording at 12:48–12:56). Defendant Gunderson placed his chair directly in front of the door with his back facing the door, and he closed the door. (Id.).

SA Nordberg began the interview by reintroducing himself, stating he was from the Minnesota Bureau of Criminal Apprehension, and introducing Investigator Cook as an Investigator from the Aitkin County Sheriff's Office. (Gov't Ex. 14 at 2:50–6:30). SA Nordberg then tells Defendant Gunderson that he is free to leave at any time, that he was not

under arrest, and that, if he wished, he could tell the officer to leave and "pound sand." (Id.). Defendant Gunderson responds that he "wants to get to the bottom of this." (Id.).

Defendant Gunderson explained that he met Defendant Walsh on a mobile dating application, Plenty of Fish, and SA Nordberg asked if Defendant Gunderson still had the phone which he used for the mobile dating application. (Id. at 6:36–10:00). Defendant Gunderson said that he did and showed the phone to SA Nordberg who asked if he could see it. (Id.). Defendant Gunderson responded "Yeah," and he handed the phone to SA Nordberg (Id.).

SA Nordberg and Defendant Gunderson then began discussing Defendant Gunderson's interactions with Defendant Walsh, Minor A, and the text messages they exchanged. (Id. at 10:00–22:00). Throughout the interview, Defendant Gunderson, SA Nordberg, and Investigator Cook had several tangential discussions about Defendant Gunderson's life in general, his relations with his kids, and his work life. (See, e.g., Id. at 23:00–36:00).

Approximately forty minutes into the interview, SA Nordberg and Defendant Gunderson began talking about other electronic devices Defendant Gunderson possessed other than the mobile phone he had already given SA Nordberg. (Id. at 39:34–47:00). Defendant Gunderson stated that he also had a laptop downstairs, and SA Nordberg told him that he would likely have to take the phone and laptop as evidence. (Id.). Defendant Gunderson inquired as to certain information he needs off of his mobile phone, and SA Nordberg provided him with the requested contact information off of the mobile phone. SA Nordberg also informed Defendant Gunderson that Kanabec County Child Protective Services would not be visiting him that day. (Id.).

SA Nordberg and Defendant Gunderson then went to the basement to retrieve the laptop, while Investigator Cook took photographs of the rooms. (Id. at 47:00–48:30). When Defendant

Gunderson gave the laptop computer to SA Nordberg, he told him it was protected by a password, and he gave SA Nordberg the password. (Id.).

Investigator Cook, SA Nordberg, and Defendant Gunderson then went into the main living space of the residence where SA Wright had been sitting with Ms. Kwapick. (Id. at 48:30–54:00). SA Nordberg again asks Defendant Gunderson if he was giving the computer voluntarily to which Defendant Gunderson responded in the affirmative stating "no warrant needed." (Id.).

The officers then exited the residence. (Id. at 54:00–56:00), and SA Nordberg terminates the recording.

After SA Nordberg left Defendant Gunderson's residence, he contacted Federal and County prosecutors to discuss how the matter should proceed. (September 13, 2019, Motions Hearing, Digital Recording at 1:01–1:12).   The prosecutors whom SA Nordberg contacted expressed a concern that Defendant Gunderson should be taken "into custody for public safety reasons." (Id.). SA Nordberg returned to Defendant Gunderson's residence to arrest him; however, Defendant Gunderson was no longer at the residence. (Id.). County law enforcement officers located Defendant Gunderson the following day, and he was placed under arrest. (Id.).

On March 6, 2019, Investigator Cook applied for, and was granted, a State Court search warrant providing law enforcement with permission to search the Facebook accounts of Defendant Walsh and Defendant Gunderson. (Gov't's Ex. 13).[12] On March 8, 2019, SA Nordberg applied for, and was granted, a State Court search warrant permitting law enforcement to search the contents of the laptop computer and cell phone seized from Defendant Gunderson

---

[12] Government's Exhibit 13 is the warrant application, supporting affidavit, and warrant to search Defendants' Facebook accounts. At the motions hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 12. (September 13, 2019, Motions Hearing, Digital Recording at 12:25–12:36).

on March 1, 2019. (Gov't's Ex. 11).[13] On March 11, 2019, SA Nordberg applied for, and was granted, a further search warrant seeking all data retained by TextNow, Inc. in reference to two particular phone numbers. (Gov't's Ex. 12).[14]

## II.   Defendants' Motions to Sever. [Docket Nos. 44, 54].

Defendant Gunderson moves to sever his case from that of his co-Defendant, Amanda Walsh, pursuant to Federal Rule of Criminal Procedure 14. (Def. Gunderson's Mot. [Docket No. 44]). Defendant Gunderson only generically asserts in his motion that a "jury will have insurmountable difficulty distinguishing the alleged acts of each defendant" and "[e]vidence may be introduced by each defendant that would be inadmissible against other defendants . . . ." (Id.).

Defendant Walsh also moves to sever her case from her co-Defendant, Matthew Gunderson, pursuant to Federal Rule of Criminal Procedure 14. (Def. Walsh's Mot. [Docket No. 54]). In support of her Motion, Defendant Walsh contends simply that the trials should be severed because the Defendants will offer conflicting defenses at trial, and a jury instruction would be insufficient to protect against the prejudicial effect which could occur. (Def. Walsh's Mem., [Docket No. 70], at 4–5).[15]

---

[13] Government's Exhibit 11 is the warrant application, supporting affidavit, and the warrant to search the laptop computer and mobile phone. At the motions hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 11. (September 13, 2019, Motions Hearing, Digital Recording at 12:25–12:36).

[14] Government's Exhibit 12 is the warrant application, supporting affidavit, and the warrant pertaining to the TextNow accounts. At the motions hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 12. (September 13, 2019, Motions Hearing, Digital Recording at 12:25–12:36).

[15] The Court notes that Defendant Walsh improperly filed a Reply memorandum purporting "to provide more detail regarding the reason that it would be prejudicial to have her trial alongside [Defendant] Gunderson." (Reply [Docket No. 74]). The undersigned will not consider Defendant Walsh's Reply memorandum. At the September 13, 2019, Motions Hearing, the parties requested the opportunity to provide the Court with supplemental briefing on the issues presented in the Defendants' dispositive Motions. The Court granted that request, and the undersigned established a briefing schedule. That schedule did not provide for a Reply memorandum, and in fact, there was no request for reply briefing submitted to the Court. Thus, the Court will not consider Defendant Walsh's Reply memorandum. The Court notes, however, that even if the Court were to consider the Reply memorandum, it would not alter the present recommendation.

In response to Defendants' Motions to Sever, the Government contends that the Defendants are properly joined and that a joint trial in this case serves the interest of justice, and it further contends that the issue of severance of Defendants is premature at the present time. (See, Gov't's Resp. to Defs.' Mots., [Docket No. 56], at 5–8).

Federal Rule of Criminal Procedure 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Federal Rule of Criminal Procedure 14(a), however, provides: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

> There is a preference in the federal system for joint trials of defendants who are indicted together. This preference is especially compelling when the defendants are charged as coconspirators. It is well settled in this circuit that a motion for relief from an allegedly prejudicial joinder of charges or defendants raises a question that is addressed to the judicial discretion of the trial court . . . .

United States v. Benton, 890 F.3d 697, 713–14 (8th Cir. 2018) (internal quotations omitted).

> Accordingly, if joinder is proper under Rule 8, a defendant seeking severance has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial. United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996). It is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials. Zafiro v. United States, 506 U.S. 534, 540 (1993) (citations omitted) . . . .

> A defendant seeking to sever his trial must therefore show that a joint trial would cause real prejudice. United States v. Mickelson, 378 F.3d 810, 817-18 (8th Cir. 2004). Real prejudice exists when (a) [a defendant's] defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants.

United States v. McConnell, No. 13-cr-273 (SRN/FLN), 2017 WL 111304, *3 (D. Minn. Jan. 11, 2017) (quotations omitted).

For example, in Bruton v. United States, 391 U.S. 123, 124 (1968), the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's codefendant had confessed and had "expressly implicat[ed]" the petitioner. Id. at n.1. The trial court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant]. It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay." Id. at 125 n. 2. The Supreme Court, however, concluded that:

> [T]he introduction of [the co-defendant's] confession posed a substantial threat to the petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Id. at 137. For that reason, the Supreme Court reversed the petitioner's conviction in Bruton. Id. at 126, 137.

However, even the Bruton Court suggested that redaction from co-conspirator testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incrimination statement, and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." Id. at 134 n. 10, 135. In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may

be required because it is more difficult for jurors to set aside such evidence. <u>Id.</u> at 208. However, the Court rejected the suggestion that the rule in <u>Bruton</u> extend to confessions that are incriminating by connection as both impractical and unnecessary. <u>Id.</u> at 208–09.

In the present case, Defendant Gunderson fails to offer any specific assertions as to how his defense may be irreconcilable with that of Defendant Walsh nor why a jury would be unable to compartmentalize the evidence as it relates to the separate Defendants. Defendant Walsh only generally asserts that she may raise a defense at trial which will conflict with Defendant Gunderson's defense; however, she too fails to offer any specific assertions as to why possible redactions or a limiting jury instruction would fail to cure any perceived potential prejudice.

The undersigned finds that, at the present time, the Defendants' have failed to make any persuasive specific argument or showing as to why a jury in the present case would either fail to understand potential limiting instructions, would otherwise be unable to appropriately compartmentalize the evidence before it, especially if presented with redacted evidence as necessary.

As set forth above, there is a strong preference in the Federal system for joint trials. In light of that preference, and at this early juncture, severance is not appropriate at this time. "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances." <u>United States v. Rios-Quintero</u>, No. 16-cr-161(1) (MJD/LIB), 2016 WL 6134545, at *13 (D. Minn. Sept. 9, 2016) (quoting <u>United States v. Billups</u>, 442 F. Supp. 2d 697, 706 (D. Minn. 2006)). If circumstances change in the future, Defendants remain free to renew their motions to sever at a more appropriate time. <u>See</u>, <u>Billups</u>, 442 F. Supp. 2d at 706.

Therefore, the undersigned recommends that both Defendant Gunderson's Motion to Sever, [Docket No. 44], and Defendant Walsh's Motion to Sever, [Docket No. 54], be **DENIED without prejudice**.

III.   **Defendant Gunderson's Motion to Suppress Statements. [Docket No. 45].**

Defendant Gunderson's Motion to Suppress Evidence, [Docket No. 45], seeks an Order of this Court suppressing his March 1, 2019, statements. Defendant Gunderson argues that the statements should be suppressed because "his statement was obtained in violation of <u>Miranda v. Arizona</u>," 384 U.S. 436 (1966), and in the alternative, as "fruit of the poisonous tree" because "his statement is the product of an unconstitutional entry into his residence." (Def. Gunderson's Mem., [Docket No. 68], at 5).

   A.   <u>**Miranda**</u>

Defendant Gunderson contends his statements on March 1, 2019, should be suppressed pursuant to <u>Miranda</u> because his "freedom of movement was not unrestrained"; because "law enforcement initiated the contact with" him; because "law enforcement purposefully set up a ruse in order to get" him "to be at the house on March 1, 2019"; because "the entire interrogations was controlled be law enforcement"; and because "it is reasonable to conclude that the assurance that he was not under arrest was only meant to give [him] a false sense of security." (Def.' Gunderson's Mem., [Docket No. 68], at 7–9).

      1.   **Standard of Review**

"[<u>Miranda</u>] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436,

444 (1966)). Accordingly, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444). "Interrogation under <u>Miranda</u> includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>United States v. Hull</u>, 419 F.3d 762, 767 (8th Cir. 2005) (quoting <u>Rhode Island v. Innis</u>, 466 U.S. 291, 300–01 (1980)).

### 2. Analysis

As noted, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Miranda</u>, 384 U.S. at 444); <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)). It is undisputed that SA Nordberg's express questioning of Defendant Gunderson on March 1, 2019, constituted interrogation. Accordingly, the sole issue now before the Court is whether Defendant Gunderson was in custody for the purpose of <u>Miranda</u> during his interview by SA Nordberg on March 1, 2019. <u>See</u>, <u>e.g.</u>, <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir. 2002) ("[T]he undisputed facts establish that [the officers] were interrogating [the defendant]. To determine whether <u>Miranda</u> rule applies, we must examine whether [the] interrogation was custodial.")

The Eighth circuit has explained:

[W]e outline six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation. The indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that

the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during the questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The first three indicia are mitigation factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. We have emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstance of a case to present all indicial; and a particular strong showing of one factor may compensate for a lesser or non-existent showing of another factor.

Id. at 500–01 (citations omitted). "These factors, however, are not exclusive, and custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (citations and quotation marks omitted). "The analysis depends upon a review of the totality of the circumstances, and [t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview." United States v. Sanchez, 676 F.3d 627, 630–31 (8th Cir. 2012) (citations and quotations omitted) (alterations in Sanchez).

The first factor weighs heavily in favor of a finding that the suspect is not in custody when officers clearly inform the suspect that he is free to leave or decline questioning. Id. at 631. In the present case, this factor weighs strongly, if not controllingly, in favor of finding that Defendant was not in custody as SA Nordberg began the interview by expressly telling Defendant Gunderson that he was free to leave and he was not under arrest, and nonetheless, Defendant Gunderson voluntarily agreed to speak with SA Nordberg indicating he just "wanted to get to the bottom of this." See, United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011) (noting that the Eighth Circuit Court of Appeals has "never held that a person was in custody

after" the person was informed he was free to leave and did not have to answer questions) (emphasis added) (citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005)); United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning.") (citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005)). Accordingly, the fact SA Nordberg clearly and plainly informed Defendant Gunderson that he was not under arrest, told Defendant Gunderson that he could tell law enforcement to "pound sand," and that he was free to leave strongly mitigates in favor of finding that Defendant Gunderson was not in custody. See, Ollie, 442 F.3d at 1138.

For the purposes of considering whether Defendant Gunderson possessed the freedom to move about during the interview on March 1, 2019, the inquiry here is how it would have objectively appeared to someone in Defendant Gunderson's position regarding whether or not he had freedom of movement. See, United States v. Rosenblum, No. 7-cr-294 (JRT/FLN), 2008 WL 608297, at *5 (D. Minn. Jan. 16, 2008) (quoting Axsom, 289 F.3d at 503). Here, SA Nordberg specifically informed Defendant Gunderson that he was free to leave; however, there is no indication in the record that Defendant Gunderson actually ever attempted to leave after the interview commenced. Nonetheless, the Court notes that after law enforcement entered Defendant Gunderson's residence and Defendant Gunderson directed SA Nordberg and Investigator Cook to his bed room, Defendant Gunderson actually left SA Nordberg and Investigator Cook in his bed room while he retrieved chairs from other parts of the house for the

three to use. On the present record, therefore, this second mitigating factor too weighs against a finding that Defendant was in custody. See, Ollie, 442 F.3d at 1138.

The third factor, which addresses whether Defendant Gunderson initiated contact with the police or voluntarily acquiesced to the questioning by the police, mitigates in favor of finding that Defendant Gunderson was not in custody as Defendant voluntarily agreed to speak with law enforcement. See, Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he voluntarily acquiesced to police questioning). In the present case, SA Nordberg from the outset told Defendant Gunderson he was free to leave at any time and free to tell law enforcement to "pound sand," and Defendant Gunderson, nonetheless, then voluntarily agreed to speak with SA Nordberg and Investigator Cook stating that he "want[ed] to get to the bottom of this."

Defendant Gunderson argues that his agreement was not "voluntary acquiescence" because law enforcement "refused" to tell him why they were at his residence before he agreed to speak with them. First, this assertion is not supported by the factual record presently before the Court. When the officers initially approached the residence, Defendant Gunderson asked if they were there to discuss the Kanabec County Child Protection Services matter, as well as, if there was anything of which he need to be aware before they entered the residence where his grandmother was located.  In response to both inquires, SA Nordberg offered to explain the situation. Law enforcement did not "refuse" to answer Defendant Gunderson's questions. SA Nordberg offered to explain the situation, and he asked if there was somewhere they could talk when Defendant Gunderson seemed apprehensive about discussing the matter around his grandmother. Second, Defendant Gunderson fails to proffer, and this Court does not find, any legal authority supporting his assertion that law enforcement officers are required to inform a

person as to the specific topic of the conversation before a person may voluntarily agree to speak with law enforcement. Therefore, the Court finds that the third factor too mitigates in favor of finding that Defendant Gunderson was not in custody.

The fourth factor, which addresses whether law enforcement used strong arm tactics or deceptive stratagems against a suspect during the questioning, does not aggravate in favor of finding that Defendant Gunderson was in custody during the March 1, 2019, interview. The Court finds no evidence on the present record, and none has been pointed out to it, of any strong arm tactics or deceptive stratagems being used against the Defendant during the March 1, 2019, interview.

Defendant Gunderson contends that this fourth factor weighs in favor of finding he was in custody because law enforcement used the "ruse" of a meeting with Kanabec County Child Protection Services to ensure Defendant Gunderson would be at the residence at a prearranged time, and he was unaware of the true purpose of the visit until he was in his bedroom. The undersigned finds this argument unpersuasive. First, the factual record now before the Court indicates that Defendant Gunderson knew from their initial contact at the residence that the law enforcement officials at his residence on March 1, 2019, were not from Kanabec County well before he directed SA Nordberg and Investigator Cook into his bedroom. SA Nordberg's testimony at the September 13, 2019, Motions Hearing provided that Investigator Cook was wearing a jacket and polo shirt which each read, "Aitkin County Sheriff's Office", and that SA Nordberg believed that upon approaching the residence he either showed Defendant Gunderson his badge on his belt near his firearm or showed him his wallet badge. Defendant Gunderson takes issue with the fact that SA Nordberg cannot be heard on the recording presenting his badge to Defendant Gunderson; however, other than idle speculation, there is nothing in the record to

suggest that SA Nordberg did not display his badge to Defendant Gunderson upon walking up to the residence. Moreover, Defendant Gunderson's comments to Ms. Kwapick well before any questioning began that the officers where <u>not</u> from Kanabec County makes evident that he was in fact aware the law enforcement officers where not from Kanabec County Child Protection Services before he agreed to answer questions from SA Nordberg.

Defendant Gunderson next contends that the fifth factor, which addresses whether the questioning took place in a "police dominated atmosphere," aggravates in favor of finding that he was in custody during the interview, arguing "the entire interrogation [being] controlled by law enforcement" and police taking control of his residence created a "police dominated atmosphere." The undersigned finds this argument likewise unpersuasive on the basis of the present record.

Defendant Gunderson's argument that a police dominated atmosphere was created by SA Nordberg directing the interrogation appears to be based on a misreading of the relevant factors. The question is not whether or not law enforcement controlled the flow of the interrogation but rather, whether the atmosphere in which the questioning occurred was police dominated. Defendant Gunderson fails to articulate, and this Court does not find, any legal authority to support his contention that a police dominated atmosphere is created by a law enforcement officer simple being the person who asks the questions in an interview.

Further, Defendant Gunderson was interviewed at his <u>own</u> home, in his <u>own</u> bedroom, and he is in fact the one who both chose the bedroom as the location of the interview and closed the door before beginning. "When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." <u>Axsom</u>, 289 F.3d at 502 (citing <u>United States v. Erving L.</u>, 147 F.3d 1240, 1247 (10th Cir. 1998)); <u>see</u>, <u>United States v. Wallace</u>,

323 F.3d 1109, 1113 (8th Cir. 2003) (noting that interview occurring in a workplace was taking place in a familiar location where the interviewee would feel more comfortable and less threatened); United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011). In addition, although there was one additional officer in the residence while SA Nordberg and Investigator Cook interviewed Defendant Gunderson, the Eighth Circuit has found that the presence of an even greater number of officers in the home of an interviewed suspect did not render an interview custodial. See, Axsom, 289 F.3d at 501 (concluding that the mere presence of nine officers in the suspect's home was not sufficient to find that the atmosphere was police dominated); United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011). Likewise, this Court has previously found that the presence of two officers with a single defendant in a room smaller than Defendant Gunderson's bedroom did not create a "police dominated atmosphere." See, e.g., United States v. Lofald, No. 15-cr-70 (ADM/LIB), 2015 WL 4636631, at *20 (D. Minn. Aug. 3, 2015). Accordingly, the fifth factor does not aggravate in favor of Defendant Gunderson being in custody during the interview.

Defendant Gunderson argues that the sixth factor, which addresses whether Defendant was arrested at the end of the interview, "is neutral at best" because "it is reasonable to conclude that the assurance that he was not under arrest was only meant to give [Defendant] Gunderson a false sense of security and to not ask for the assistance of an attorney." (Def. Gunderson's Mem., [Docket No. 68], at 9). Here again, on the present record, the undersigned is not persuaded.

In the present case, Defendant Gunderson was in fact not arrested upon the conclusion of his March 1, 2019, interview. Likewise, at no time before, during, or after the interview was Defendant Gunderson ever handcuffed or in any way physically restrained by law enforcement officers. Defendant Gunderson, without the benefit of any legal citation, argues that SA

Nordberg returning to the residence an hour or two later to attempt to arrest Defendant Gunderson is substantially similar to Defendant being arrested at the conclusion of an interview. However, SA Nordberg specifically testified that he only returned to attempt to arrest Defendant Gunderson after he had conferred with County and Federal prosecutors who expressed their independent concern for public safety. It was not SA Nordberg's personal intention to arrest Defendant Gunderson at the conclusion of the interview; that decision was only reached after SA Nordberg had left the residence and he had conferred with prosecutors. Further, Defendant was not even arrested when SA Nordberg returned to the residence on March 1, 2019, because Defendant was not then at the residence when SA Nordberg returned. Defendant Gunderson was not arrest until the following day.

Moreover, both the Supreme Court of the United States and the Eighth Circuit have held that "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984); United States v. Griffin, 922 F.2d 1343, 1356 (8th Cir. 1990) (quoting Berkemer, 468 U.S. at 442); United States v. Clark, No. 15-cr154 (DWF/LIB), 2015 WL 4964665, at *5 (D. Minn. Aug. 19, 2015); United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011). Accordingly, it is irrelevant that SA Nordberg later returned to the residence at the direction of prosecutors in an attempt to arrest Defendant Gunderson. The simple fact of the matter is that SA Nordberg clearly and objectively informed Defendant Gunderson prior to the Mach 1, 2019, interview that he was not under arrest, and in fact, SA Nordbeg did not arrest Defendant Gunderson at the conclusion of the interview. Thus, the Court concludes that the sixth factor does not aggravate in favor of Defendant Gunderson being in custody during the interview.

Upon consideration of the "totality of the circumstance", the Court concludes that a reasonable person in Defendant Gunderson's position would have objectively felt free to terminate the interview and, as such, Defendant Gunderson was <u>not</u> in custody during the March 1, 2019, interview. Because Defendant Gunderson was not in custody for the purposes of <u>Miranda</u>, the absence of a formal <u>Miranda</u> warning does not entitle Defendant Gunderson to have the statements he made during that interview suppressed.

### B. Fruit of the Poisonous Tree

Defendant Gunderson also argues that his statement during the March 1, 2019, interview, was "the product of an unconstitutional entry into his residence," and therefore, his statement must be suppressed as the "fruit of the poisonous tree." (Def. Gunderson's Mem., [Docket No. 68], at 9–15). Defendant Gunderson argues that "[i]t stretches credulity to suggest that [he] could knowingly consent to law enforcement's entry into the residence when" SA Nordberg "set up a ruse with the cooperation of Kanabec County Social Services to falsely make [Defendant] Gunderson believe that social services was going to be meeting with him at noon on March 1, 2019, and not three law enforcement officers." (<u>Id.</u> at 10–11).

As already discussed above, however, this argument is unsupported by the factual record presently before the Court. Although SA Nordberg had Kanabec County Child Protection Services contact Defendant Gunderson to arrange the meeting, Defendant Gunderson was aware that SA Nordberg, Investigator Cook, and SA Wright were not from Kanabec County upon their initial contact with him and before he provided consent for them to enter the residence. Investigator Cook was wearing a jacket and shirt which each read, "Aitkin County Sheriff's Office," and SA Nordberg testified that he either showed his belt or wallet badge to Defendant Gunderson upon first approaching the residence's porch. Moreover, Defendant Gunderson's own

conduct well in advance of the interview also demonstrates he knew the officers were not from Kanabec County as he specifically told his grandmother that the officer were not from Kanabec County.

Moreover, Courts have determined that "[e]ven if agents employ a false identity . . . [a] voluntary admission permits an agent to enter private premises to gather information." United States v. Shabazz, 883 F. Supp. 422, 427 (D. Minn. 1995) (citing United States v. Wagner, 884 F.2d 1090, 1094–95 (8th Cir. 1989)). Additionally, "[t]he Eighth Circuit has determined that one who consents to an undercover agent's entry into his or her home has no legally enforceable expectation that the agent is not an undercover police agent." Shabazz, 883 F. Supp. at 427 (citing Wagner, 884 F.2d at 1094–95).

In the present case, Defendant Gunderson specifically and affirmatively permitted readily apparent law enforcement officers entry into his residence. This represents a constitutionally permissive entry by the officers even if Defendant was unaware before Mach 1, 2019, that law enforcement officers rather than Kanabec County Child Protection Services would be coming to his residence. See, e.g., United States v. Wagner, 884 F.2d 1090, 1094–95 (8th Cir. 1989) ("In Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed. 2d 312 (1966), the Supreme Court held that the Fourth Amendment does not categorically prohibit a law enforcement agent from gaining entry into private homes by misrepresenting his identity."); United States v. Shabazz, 883 F. Supp. 422, 427 (D. Minn. 1995); United States v. Shigemura, 682 F.2d 699, 701 (8th Cir. 1982); United States v. Robinson, 720 F.2d 18, 19 (8th Cir. 1983); United States v. Davis, 646 F.2d 1298, 1301 (8th Cir. 1981); United States v. Raines, 536 F.2d 796, 799–802 (8th Cir. 1976).

Not only is the record now before the Court devoid of evidence tending to show any use of force or intimidation by law enforcement to gain entry into Defendant Gunderson's residence,

but what evidence there is indicates that Defendant Gunderson opened his door and admitted the officers into the residence <u>after</u> he had affirmatively agreed to speak with them. Because Defendant Gunderson consented to the entry, it was constitutionally permissive. <u>See</u>, <u>United States v. Hampton</u>, 260 F.3d 832, 835 (8th Cir. 2001).

Accordingly, the Court finds unpersuasive Defendant Gunderson's argument that his statement during the March 1, 2019, interview should be suppressed as the fruit of the poisonous tree resulting from a constitutionally infirm initial entry by law enforcement into his residence.

Therefore, based on the foregoing, the undersigned recommends that Defendant Gunderson's Motion to Suppress Statements, [Docket No. 45], be **DENIED**.

## IV.   Defendant Gunderson's Motion to Suppress Evidence. [Docket No. 46].

Defendant Gunderson's Motion to Suppress Evidence, [Docket No. 46], seeks an Order of this Court suppressing all the evidence seized through the execution of the search warrants on his cell phone and laptop computer. Defendant Gunderson's sole argument in support of this Motion, however, is the exact same argument he raised in support of his contention that his March 1, 2019, statements should be suppressed as the fruit of the poisonous tree: that the search warrants were the product of an unconstitutional initial entry into the residence through the use of subterfuge.

The undersigned has already considered and rejected this argument. That discussion will not be repeated here. Suffice it to say that, for the same reasons discussed above, Defendant Gunderson's argument is unsupported by the law or the facts of this case, and law enforcement's initial entry into the residence on March 1, 2019, was constitutionally permissible.

Defendant Gunderson does not allege that the Search Warrants themselves lacked probable case. Besides his argument that the search warrants were based on an "illegal entry"

Defendant Gunderson fails to offer any other basis in support of his Motion to Suppress Evidence.

Therefore, based on the foregoing, the undersigned recommends that Defendant Gunderson's Motion to Suppress Evidence, [Docket No. 46], be **DENIED**.

## V.      Defendant Walsh's Motion to Suppress Evidence. [Docket No. 52].

Defendant Walsh's Motion to Suppress Evidence, [Docket No. 52], seeks an Order of this Court suppressing any evidence obtained as a result of the search of Minor A's phone, as well as, Defendant Walsh's mobile phones and her TextNow account. (See, Def. Walsh's Mem., [Docket No. 70], at 4). Defendant Walsh argues that the evidence obtained as a result of the search of Minor A's mobile phone must be suppressed because it "was withheld from her by Dustin Clark and subject to an illegal search and seizure while he was acting as an agent of the government," and the "other devices in this case must be suppressed as fruit of that initial illegal search." (Id. at 1).[16]

The Government argues that Dustin Clark was acting as a private citizen at all relevant times, and under the private search doctrine, the Fourth Amendment was not implicated by his search of the phone. (See, Gov't's Mem., [Docket No. 73], at 15–20).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Fourth Amendment's protections apply only to government actions, or those acting at the direction of government officials. See, e.g., United States v. Jacobsen, 466 U.S. 109, 113 (1984).

---

[16] Defendant Walsh initially "raised a four-corners challenge to numerous search warrants"; however, on October 15, 2019, she filed a letter on this Court's docket "withdraw[ing] her four-corners challenge to the search warrants." (Letter [Docket No. 69]). Defendant's sole challenge to the search warrants now is that they are the fruit of the purported illegal search and seizure of Minor A's phone. (See, Def. Walsh's Mem. [Docket No. 70]).

The Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" Id. at 113–14 (quoting Walter v. United States, 447 U.S. 649, 662 (1980)). However, the Fourth Amendment does protect "against such instructions if the private party acted as an instrument or agent of the Government." Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 614 (1989).

As the Eighth Circuit Court of Appeals recently reiterated, when assessing whether a seizure was conducted by  private action, Courts consider three factors: "[1] whether the government had knowledge of and acquiesced in the intrusive conduct; [2] whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and [3] whether the citizen acted at the government's request." United States v. Highbull, 894 F.3d 988, 993 (8th Cir. 2018) (alteration in original). It is the defendant who "bears the burden of proving by a preponderance of the evidence that a private party acted as a government agent." Id.

## A. Whether the Government Had Knowledge of and Acquiesced in the Intrusive Conduct

Defendant Walsh argues that "at the time the phone was shown to Dep[uty] Bennett, Dustin [Clark] was no longer acting in his capacity as a private citizen, but as a government agent" because Dustin had explicitly told the dispatcher that he and the others had seized Defendant "Walsh and were not allowing her to leave, and the dispatcher 'acquiesced in the intrusive conduct'" of which Deputy "Bennett was fully aware" as well. (Def. Walsh's Mem., [Docket No. 70], at 3). The Court does not find Defendant Walsh's argument compelling.

In the instant case, Defendant Walsh initially gave Minor A's voluntarily phone to Savannah Clark, and Ms. Clark gave it to Dustin Clark. Mrs. Clark and Mr. Clark then looked

through Minor A's phone, and they discovered independently the content which caused them to contact law enforcement. After Defendant Walsh tried to take back Minor A's phone, Dustin Clark again independently took it from Defendant Walsh. This all occurred <u>before</u> Dustin Clark called 911. The 911 operator simply could not have acquiesced in Dustin Clark's conduct because Dustin Clark had already searched Minor A's phone and had already re-taken it from Defendant Walsh at the time he called 911. The same is true of Deputy Bennett. At the time Deputy Bennett arrived at the residence and Dustin Clark showed him the phone, Dustin Clark had already re-taken Minor A's phone from Defendant Walsh and independently searched it multiple times.

Defendant Walsh appears to argue that Deputy Bennett had knowledge of the "intrusive conduct" and "implicitly endorsed it" because Deputy Bennet "knew that Dustin had no permission to scroll through" Minor A's "phone, but he stood by and let Dustin commit the search for him . . . ." (Def. Walsh's Mem., [Docket No. 70], at 3–4). Here too, the Court finds Defendant's argument to be unpersuasive.

First, Defendant's purported factual assertion that Deputy Bennet knew that Dustin lacked permission to scroll through Minor A's phone is unsupported by the record presently before the Court. There is no indication that when Deputy Bennett arrived on scene Defendant Walsh was still actively insisting the phone be returned to her. In fact, the record reflects that when Deputy Bennett arrived, Defendant Walsh was somewhere inside the residence. Further, Deputy Bennett testified at the September 13, 2019, Motions Hearing that police dispatch had not informed him of any dispute regarding the possession or ownership of a cell phone; he was only informed that a disturbance or altercation "of some kind" had occurred and that some images had been found on a cell phone.

31

Moreover, even assuming solely for the sake of argument that Dustin Clark had wrongfully taken Minor A's phone from Defendant Walsh and Deputy Bennett knew it, Dustin Clark's status as a private actor in taking Minor A's phone, whether "innocent or deliberate . . . reasonable or unreasonable," does <u>not</u> violated the Fourth Amendment. <u>United States v. Jacobsen</u>, 466 U.S. 109, 115 (1984). Even if, Deputy Bennett knew Dustin Clark had previously improperly taken Minor A's phone from Defendant Walsh at the time Dustin Clark showed him the phone, that does not mean Deputy Bennett acquiesced before hand in the intrusive conduct by Dustin Clark. <u>See</u>, <u>United States v. Highbull</u>, 894 F.3d 988, 992–93 (8th Cir. 2018) (affirming a district court ruling that a cell phone stolen by a private actor from the defendant's car <u>and then</u> given to police was admissible under the private actor exception); <u>United States v. Jacobsen</u>, 466 U.S. 109, 119 (1984) (finding that an officer's "viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment," even though the private actor's conduct "might have been impermissible for a government agent"); <u>Walter v. United States</u> 447 U.S. 649, 656 (1980) ("[T]here was nothing wrongful about the Government's acquisition of the packages or its examination of their contents to the extent that they had already been examined by third parties."); <u>United States v. Mays</u>, No. 19-cr-0075 (ECT/HB), 2019 WL 5150026, at *4 (D. Minn. July 23, 2019) (finding the search and seizure of laptop permissible under the private actor exception where law enforcement received stolen laptop knowing the laptop had been taken without permission),  <u>report and recommendation adopted</u>, 2019 WL 4565636 (D. Minn. Sept. 20, 2019).

For the foregoing reasons, the undersigned finds that the first factor weighs against concluding that Dustin Clark was acting as a government agent.

**B. Whether Dustin Clark intended to assist law enforcement or instead acted to further his own purposes**

Even when government officials know of a warrantless search by a non-government official, the Eighth Circuit Court of Appeals has "been unwilling to impute agency where the private actor was not 'motivated solely or even primarily by the intent to aid the officers' and where the government did not request the challenged search." United States v. Highbull, 894 F.3d 988, 992 (8th Cir. 2018) (citing United States v. Smith, 383 F.3d 700, 705 (8th Cir. 2004).

In the present case, Defendant Walsh contends that Dustin Clark intended to help law enforcement because he told Defendant Walsh she was going to jail. (Def. Walsh's Mem., [Docket No. 70], at 3). This assertion falls well short of Defendant Walsh burden of proving by a preponderance of the evidence that Dustin Clark was motivated solely or even primarily by his intent to aid law enforcement.

At best, Defendant Walsh's assertion could be read as contending that Dustin Clark was partially motivated by his desire to assist law enforcement; however, the Eighth Circuit Court of Appeals has specifically "emphasized that the fact a private citizen is motivated in part by a desire to aid law enforcement does not in and of itself transform [him] into a government agent." United States v. Highbull, 894 F.3d 988, 993 (8th Cir. 2018) (quotation marks omitted) (quoting United States v. Smith, 383 F.3d 700, 705 (8th Cir. 2004)).

In fact, in Highbull, supra, a case materially similar to the present circumstances, the Eighth Circuit Court of Appeals upheld a district court's finding that a private actor was not motivated primarily by a desire to help law enforcement when the private actor's actions also led to the protection of a loved one; there the private actor's daughter. Id., at 993. Here, Dustin Clark

specifically told law enforcement that he was doing what he did to help Minor A who needed to be protected.

For the foregoing reasons, the undersigned finds that the second factor also weighs against concluding that Dustin Clark was acting as a government agent.

### C. Whether Dustin Clark Acted at the Government's Request

The record before the Court makes evident clear that Dustin Clark did <u>not</u> act at the request of any government official. As already discussed above, Dustin Clark looked through Minor A's phone and re-took it from Defendant Walsh <u>before</u> he ever interacted with any government official. Defendant Walsh concedes as much in her memorandum in support of the present Motion. (See, Def. Walsh's Mem., [Docket No. 70], at 3) ("no one explicitly told Dustin or the other to inspect the phone").

Therefore, the undersigned finds that this third factor likewise weighs against concluding that Dustin Clark was acting as a government agent.

Accordingly, weighing the factors reiterated by the Eighth Circuit Court of Appeals in <u>United States v. Highbull</u>, 894 F.3d 988 (8th Cir. 2018), the undersigned finds that at the time relevant to the present Motion, Dustin Clark was acting wholly as a private actor, and therefore, Deputy Bennett's acceptance of Minor A's phone voluntarily from Dustin Bennett was <u>not</u> violative of Defendant Walsh's Fourth Amendment rights.

For these reasons, to the extent Defendant Walsh's Motion to Suppress Evidence seeks suppression of evidence seized from the search of Minor A's phone, the undersigned recommends that Defendant Walsh's Motion to Suppress Evidence, [Docket No. 52], be **DENIED**.

Defendant Walsh also seeks suppression of other evidence obtained through the searches of her two phones, as well as, her TextNow account "[t]o the extent that the search warrants" upon which those searches were based relied upon the evidence obtained through the search of Minor A's phone. (Def. Walsh's Mem., [Docket No. 70], at 4). Defendant Walsh argues that the search warrants are invalid "as fruits of the poisonous tree" to the extent they are based on evidence obtained through the allegedly wrongful search of Minor A's phone. (Id.).

The Court has already determined, however, that all of the underlying evidence obtained through a search of Minor A's phone was seized in a constitutionally permissive manner; therefore, no poison taint flows from the search of Minor A's phone. Defendant Walsh fails to offer any other independent basis as to why other evidence obtained from her own two cell phones and her TextNow account through the execution of otherwise unchallenged search warrants should be suppressed.

Therefore, to the extent Defendant Walsh's Motion to Suppress Evidence, [Docket No. 52], seeks the suppression of the evidence obtained through the execution of other, subsequent search warrants for her own two cell phones and her TextNow account, the undersigned recommends that Defendant Walsh's Motion to Suppress, [Docket No. 52], be **DENIED**.

## VI.   Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant Gunderson's Motion to Sever Defendants, [Docket No. 44], be **DENIED without prejudice**;

2. Defendant Gunderson's Motion for Suppression of Confessions or Statements in the Nature of Confessions, [Docket No. 45], be **DENIED**;

3.  Defendant Gunderson's Motion for Suppression of Evidence Obtained With a Warrant, [Docket No. 46], be **DENIED**;

4.  Defendant Walsh's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, [Docket No. 52], be **DENIED**; and

5.  Defendant Walsh's Motion to Sever Defendants, [Docket No. 54], be **DENIED without prejudice**.

Dated: December 6, 2019                                   s/Leo I. Brisbois
                                                        Hon. Leo I. Brisbois
                                                        U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.